FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

2017 JUL 19 PM 1:27

| | |
|---|---|
| MARK DAVIS, MARK GERALDS, JESSE GUARDADO, JOSEPH JORDAN, KHALID PASHA, ROBERT RIMMER, JOHN TROY, STEVEN STEIN, and GARY WHITTON, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| JULIE JONES, KEVIN JORDAN, and BARRY REDDISH, in their official capacities as employees of the Florida Department of Corrections, | ) ) ) ) ) |
| Defendants. | ) ) |

Civil Action No.: 3:17-cv-820-J-34 PDB

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

## CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Plaintiffs Mark Davis, Mark Geralds, Jesse Guardado, Joseph Jordan, Khalid Pasha, Robert Rimmer, John Troy, Steven Stein, and Gary Whitton are inmates on Florida's death row.  On behalf of themselves and all other similarly situated individuals, they bring this lawsuit to obtain declaratory and injunctive relief from a patently unconstitutional Florida Department of Corrections ("FDOC") policy that automatically places Florida prisoners sentenced to death in permanent solitary confinement, regardless of their behavior while incarcerated.

2.     The FDOC has held Plaintiffs in permanent solitary confinement, called "single-cell special housing," for between 4 and 30 years, an unconscionably long period of time.  Under

FDOC policy, each Plaintiff and class member will remain in single-cell special housing until he receives relief from his death sentence or is executed, a process that will take many years, potentially decades.

3.     The FDOC's policy of automatic, indefinite solitary confinement for death row inmates is extreme, debilitating, and inhumane, violates contemporary standards of decency, and poses an unreasonable risk of serious harm to the health and safety of Plaintiffs and class members. Defendants continuously deprive Plaintiffs and class members of the basic human contact required to maintain their mental and physical health. Plaintiffs and class members languish alone in cramped, concrete, windowless cells, often for twenty-four hours a day, for years on end. Defendants severely restrict their phone calls, afford them extremely limited contact with other inmates and prison staff, provide them minimal opportunity for exercise, and deprive them of all vocational, recreational, and educational programming.

4.     Predictably, the conditions on Florida's death row have not only created a serious risk of harm to the health and safety of Plaintiffs and class members, but have in fact caused harm, both psychological and physical, to Plaintiffs and class members.

5.     Defendants have been and continue to be deliberately indifferent to the psychological and physical trauma that the FDOC's policy of permanent solitary confinement threatens to inflict, and in fact inflicts, on Plaintiffs and class members. The scientific literature exposing the deleterious health effects of prolonged solitary confinement is well-known to Defendants. A number of judicial decisions have recognized this scientific research when condemning the practice of prolonged solitary confinement; the international human rights community has embraced this scientific research by categorizing prolonged solitary confinement as torture; and other prison systems in the United States and around the world have abandoned

2

the use of prolonged solitary confinement because of this scientific research. The actual adverse health effects that the FDOC's policy of permanent solitary confinement has had on Plaintiffs and class members is equally well-known to Defendants, as Plaintiffs and class members have been and remain in Defendants' own custody and care. Defendants nonetheless adhere to the FDOC's rigid policy.

6.      The conditions on Florida's death row, coupled with Defendants' deliberate indifference to the trauma that such conditions can and do inflict on Plaintiffs and class members, violate the prohibition on cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution.

7.      In addition to violating the Eighth Amendment, the conditions on Florida's death row violate the Due Process Clause of the Fourteenth Amendment. When compared to the conditions of confinement for Florida prisoners not sentenced to death, the conditions on Florida's death row impose an atypical and significant hardship, and Defendants provide Plaintiffs and class members no meaningful opportunity to obtain relief from that hardship.

8.      Plaintiffs and class members are entitled to (a) a declaration that Defendants' policy of automatically placing them in permanent solitary confinement violates their constitutional rights, and (b) an injunction compelling Defendants to cease holding Plaintiffs and class members in solitary confinement, except for limited periods and only when based on an individualized determination that a valid penological purpose for such confinement exists.

## JURISDICTION AND VENUE

9.      Plaintiffs, on behalf of themselves and all class members, bring claims under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution.

3

10.     This Court has jurisdiction for claims seeking declaratory and injunctive relief pursuant to 28 U.S.C. §§ 1331 and 1343 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

11.     Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims brought by Plaintiffs, on behalf of themselves and all class members, have occurred in this District.

## PARTIES

12.      Plaintiff Mark Davis is a resident of Union Correctional Institution, 7819 NW 228th Street, Raiford, Florida 32026 ("UCI").  He awaits his execution in the event pending post-conviction proceedings do not succeed in avoiding that result.  He has spent over 30 years on Florida's death row.

13.     Plaintiff Mark Geralds is a resident of UCI, 7819 NW 228th Street, Raiford, Florida 32026.  He awaits his execution in the event pending post-conviction proceedings do not succeed in avoiding that result.  He has spent 24 years on Florida's death row.

14.     Plaintiff Jesse Guardado is a resident of UCI, 7819 NW 228th Street, Raiford, Florida 32026.  He awaits his execution in the event pending post-conviction proceedings do not succeed in avoiding that result.  He has spent 12 years on Florida's death row.

15.     Plaintiff Joseph Jordan is a resident of Florida State Prison, 23916 NW 83rd Street, Raiford, Florida 32026 ("FSP").  He awaits his execution in the event pending post-conviction proceedings do not succeed in avoiding that result.  He has spent 4 years on Florida's death row.

4

16.     Plaintiff Khalid Pasha is a resident of FSP, 23916 NW 83rd Street, Raiford, Florida 32026. He awaits his execution in the event pending post-conviction proceedings do not succeed in avoiding that result. He has spent over 4 years on Florida's death row.

17.     Robert Rimmer is a resident of UCI, 7819 NW 228th Street, Raiford, Florida 32026. He awaits his execution in the event pending post-conviction proceedings do not succeed in avoiding that result. He has spent 18 years on Florida's death row.

18.     John Troy is a resident of UCI, 7819 NW 228th Street, Raiford, Florida 32026. He awaits his execution in the event pending post-conviction proceedings do not succeed in avoiding that result. He has spent 13 years on Florida's death row.

19.     Steven Stein is a resident of UCI, 7819 NW 228th Street, Raiford, Florida 32026. He awaits his execution in the event pending post-conviction proceedings do not succeed in avoiding that result. He has spent 26 years on Florida's death row.

20.     Gary Whitton is a resident of UCI, 7819 NW 228th Street, Raiford, Florida 32026. He awaits his execution in the event pending post-conviction proceedings do not succeed in avoiding that result. He has spent 25 years on Florida's death row.

21.     Defendant Julie Jones is the Secretary of the FDOC. She provides final approval of rules applicable to death row inmates. As an employee of the FDOC, she acts under color of state law. She is sued in her official capacity for declaratory and injunctive relief.

22.     Defendant Kevin Jordan is the warden of UCI. He is in charge of implementing rules and procedures for the death row unit in that facility. As an employee of the FDOC, he acts under color of state law. He is sued in his official capacity for declaratory and injunctive relief.

23.     Defendant Barry Reddish is the warden of FSP.  He is in charge of implementing rules and procedures for the death row unit in that facility.  As an employee of the FDOC, he acts under color of state law.  He is sued in his official capacity for declaratory and injunctive relief.

## FACTUAL ALLEGATIONS

### I.    CONDITIONS ON FLORIDA'S DEATH ROW

#### A.    Plaintiffs' Automatic, Permanent Assignment to "Single-Cell Special Housing"

24.     The FDOC requires "single-cell special housing"—*i.e.,* solitary confinement—for any person sentenced to death. *See* Fla. Admin. R. 33-601.830(a).  Correspondingly, the FDOC mandates that "[d]eath row housing cells shall be separate from general population housing." *See id.*  Therefore, as soon as an individual is sentenced to death and transported to death row at either UCI or FSP, he is placed permanently and indefinitely in solitary confinement.

25.     The FDOC rules theoretically require that "[a]t least annually, a death row inmate shall be reviewed by his classification officer to determine overall institutional adjustment based on the inmate's disciplinary history, participation in programming, and cooperation with staff." *See* Fla. Admin. R. 33-601.830.  However, Defendants have never moved any death row inmate from "single-cell special housing" to general population or any other form of less restrictive housing as a result of any annual review or otherwise.

26.     FDOC inmates who are not sentenced to death are initially classified and assigned to facilities and housing units "based upon such factors as nature and severity of offense, characteristics of sentence, criminal history, age, health status, and any other factor relating to the security and order of the institution or the security and safety of the general public." *See* Fla. Admin. R. 33-601.210(1)(a).  However, in contrast to FDOC inmates sentenced to death, FDOC inmates who are not sentenced to death—even those assigned to maximum security facilities—

6

are not initially placed in conditions anywhere near as restrictive and severe as "single-cell special housing." FDOC inmates not sentenced to death are placed in harsh conditions similar to the conditions on death row—*e.g.*, "disciplinary confinement," "administrative confinement," or "close management"—only after they have demonstrated non-compliant behavior *while in prison*, or have demonstrated *while in prison* that their safety in general population is at serious risk, that they warrant placement in such conditions. *See* Fla. Admin. R. 33-601.800, 33-602.220, 33-602.222. Further, FDOC inmates not sentenced to death are placed in such conditions only after being given an opportunity to challenge that placement. *See, e.g.*, Fla. Admin R. 33-601.304 – 308, 33-601.800(3). And, as described in more detail below, FDOC inmates not sentenced to death are never placed in such conditions permanently; to the contrary, they are placed in such conditions for a limited, prescribed period or receive mandatory, routine reviews to determine whether there continues to be a penological justification for keeping them in such conditions. *See, e.g.,* Fla. Admin R. 33-601.314, 33-601.800(16); 33-602.220(1), (3), 33-602.222(8).

**B.    Conditions on Death Row at Union Correctional Institution**

27.    Upon information and belief, the death row at UCI is composed of twelve wings, each containing twenty-eight cells. UCI's death row houses over 330 prisoners, including Mr. Davis, Mr. Geralds, Mr. Guardado, Mr. Rimmer, Mr. Troy, Mr. Stein, and Mr. Whitton.

28.    Mr. Davis, Mr. Geralds, Mr. Guardado, Mr. Rimmer, Mr. Troy, Mr. Stein, Mr. Whitton, and the class members at UCI are housed individually, without a cellmate, in a cell that is approximately sixty square feet, or approximately nine feet by seven feet.

7

29.     Cells on UCI's death row contain a bed, a combination sink/toilet, a locker for belongings, and a small writing table.  Because there is no stool, inmates typically sit on the locker when using the writing table.

30.     In the summer months, cell walls are hot to the touch.  There is minimal ventilation, and the water in the cells does not get cold.

31.      Mr. Davis, Mr. Geralds, Mr. Guardado, Mr. Rimmer, Mr. Troy, Mr. Stein, and Mr. Whitton cannot see any other inmate from their respective cells.  Nor can any other inmate on death row at UCI see other inmates from his cell.

32.     Mr. Davis, Mr. Geralds, Mr. Guardado, Mr. Rimmer, Mr. Troy, Mr. Stein, Mr. Whitton, and the class members at UCI do not eat their meals in a cafeteria or any other group setting.  Each meal they receive is delivered to and consumed in their individual cells.

33.     Mr. Davis, Mr. Geralds, Mr. Guardado, Mr. Rimmer, Mr. Troy, Mr. Stein, and Mr. Whitton are given the opportunity to leave their cells three times per week to take a shower, each by himself, for between five and ten minutes.  The same is true of all other inmates on death row at UCI.

34.     Prison officials will sometimes discourage showering, and in such instances will "toss" —or dismantle the contents of—inmates' cells if they opt to take showers.

35.     In theory, Mr. Davis, Mr. Geralds, Mr. Guardado, Mr. Rimmer, Mr. Troy, Mr. Stein, Mr. Whitton, and the other inmates on death row at UCI are given the opportunity to leave their cells two times per week for three hours to go to an exercise yard.  In practice, these three-hour blocks are often cancelled and/or shortened due to guard shortages, events in other parts of the prison, or other circumstances.  Further, these three-hour blocks begin when the first inmate is taken from his cell, and end when the last inmate is returned to his cell.  Thus, Mr. Davis, Mr.

8

Geralds, Mr. Guardado, Mr. Rimmer, Mr. Troy, Mr. Stein, Mr. Whitton, and the other inmates on death row at UCI frequently spend far less than three hours outside of their cell during the periods allotted for exercise.

36.     Individual inmates whom corrections officers dislike or view as problematic are deprived of even these blocks of yard-time.

37.     In some cases, inmates deemed to have disciplinary issues are barred from the exercise yard and instead placed by themselves in cages—smaller areas, slightly larger than the size of their cells and enclosed on all sides by fencing. In other cases, UCI death row inmates who have been placed in disciplinary confinement are denied exercise altogether—a guard will walk by the inmate's cell with a clipboard for the benefit of the security camera and will mark down that the inmate refused exercise regardless of whether the inmate wanted to exercise or not.

38.     Mr. Davis, Mr. Geralds, Mr. Guardado, Mr. Rimmer, Mr. Troy, Mr. Stein, Mr. Whitton, and the other death row inmates at UCI have the opportunity to spend time outside of their cells at the prison law library once a week.  Death row inmates are permitted to visit the law library only one at a time, however, so they do not have contact with fellow death row inmates when they go.

39.     With the exception of "emergency situations, such as notifications of family deaths, and when necessary to ensure the inmate's access to attorneys or the courts," *see* Fla. Admin. R. 33-601.830(7)(k), Mr. Davis, Mr. Geralds, Mr. Guardado, Mr. Rimmer, Mr. Troy, Mr. Stein, Mr. Whitton, and the other death row inmates at UCI are given the opportunity to make only one 15 minute phone call per month to a person preapproved by prison officials.

40.     Although death row regulations explicitly permit death row inmates to participate in self-improvement programs absent a security threat, *see* Fla. Admin. R. 33-601.830(7)(n), the

FDOC does not offer Mr. Davis, Mr. Geralds, Mr. Guardado, Mr. Rimmer, Mr. Troy, Mr. Stein, Mr. Whitton, or other death row inmates at UCI any opportunities to participate in educational or self-improvement programs.

41.     In sum, on most days, Mr. Davis, Mr. Geralds, Mr. Guardado, Mr. Rimmer, Mr. Troy, Mr. Stein, Mr. Whitton, and other death row inmates at UCI spend twenty-four hours confined to their cells, with virtually no human contact. On other days, Mr. Davis, Mr. Geralds, Mr. Guardado, Mr. Rimmer, Mr. Troy, Mr. Stein, Mr. Whitton, and other class members at UCI spend extremely limited periods outside of their cells, with correspondingly limited human contact.

42.     As explained in greater detail below, because Mr. Davis, Mr. Geralds, Mr. Guardado, Mr. Rimmer, Mr. Troy, Mr. Stein, Mr. Whitton, and the class members at UCI have been subjected to indefinite solitary confinement, they are at serious risk of suffering, and have suffered, serious harm to their mental and physical health, including but not limited to depression, psychosis, suicidal tendencies, and degeneration of eyes, teeth, muscles, and joints.

43.     As explained in greater detail below, Defendants Jones and Jordan have been, and continue to be, deliberately indifferent to the obvious and well-known risks that indefinite solitary confinement poses, as well as the obvious harm that such confinement has caused, to the mental and physical health of class members at UCI.

## C.     Conditions on Death Row at Florida State Prison

44.     Death row at FSP is composed of one wing ("G Wing"), containing 68 cells. FSP's death row houses approximately 63 prisoners, including Mr. Pasha and Mr. Jordan.

45.     Mr. Pasha, Mr. Jordan, and the class members at FSP are housed individually, without a cellmate, in a cell that is approximately 54 square feet, or approximately nine and a half feet by six feet.

46.     Cells contain a bed, a combination sink/toilet, a locker for belongings, and a small writing table.

47.     In the summer months, cell walls are hot to the touch.  There is minimal ventilation and fans placed in corridors are pointed toward guards, not inmates' cells.  Inmates on the second floor of the corridor are subject to even hotter conditions.

48.     Neither Mr. Pasha nor Mr. Jordan can see any other inmate from his cell.  Nor can any other inmate on death row at FSP see other inmates from his cell.

49.     Mr. Pasha, Mr. Jordan, and the other inmates on death row at FSP do not eat their meals in a cafeteria or any other group setting.  Each meal they receive is delivered to and consumed in their individual cells.

50.     Mr. Pasha and Mr. Jordan are given the opportunity to leave their cells three times per week to take a shower, each by himself, for between five and ten minutes.  The same is true of all other inmates on death row at FSP.

51.     In some cases, and at the total discretion of guards, inmates are only allowed a shower that is less than five minutes long.

52.     Prison officials will sometimes discourage showering, and will often "toss"—or dismantle the contents of—inmates' cells if they opt to take showers.  Inmates occasionally return to their cells after showing to find their belongings strewn about.

53.     In theory, Mr. Pasha, Mr. Jordan, and the other inmates on death row at FSP are given the opportunity to leave their cells two times per week for three hours to go to an exercise

yard. In practice, these three-hour blocks are often cancelled and/or shortened due to guard shortages, events in other parts of the prison, or other circumstances. Further, these three-hour blocks begin when the first inmate is taken from his cell, and end when the last inmate is returned to his cell. Thus, Mr. Davis, Mr. Jordan, and the other inmates on death row at FSP frequently spend far less than three hours outside of their cell during the periods allotted for exercise.

54.     Individual inmates whom corrections officers dislike or view as problematic are deprived of even these short blocks of exercise time.

55.     The exercise yard offers no barriers or shade from the sun, and thus poses health risks to inmates. Accordingly, some inmates decline the opportunity to participate in "yard time."

56.     Inmates deemed to have disciplinary issues are barred from the exercise yard altogether and instead placed alone in cages—smaller areas, slightly larger than the size of their cells and enclosed on all sides by fencing.

57.     Mr. Pasha, Mr. Jordan, and other death row inmates at FSP have the opportunity to spend time outside of their cells at the prison law library. Death row inmates are permitted to visit the law library only one at a time, however, so they do not have contact with fellow death row inmates when they go. While at the library, inmates are required to sit inside a small cell/room to read.

58.     Mr. Pasha, Mr. Jordan, and other death row inmates at FSP can only make one 15 minute phone call per month to a person preapproved by prison officials. Otherwise, death row inmates are prohibited from making or receiving calls outside of "emergency situations, such as

notifications of family deaths, and when necessary to ensure the inmate's access to attorneys or the courts." *See* Fla. Admin. R. 33-601.830(7)(k).

59.     Although death row regulations explicitly permit death row inmates to participate in self-improvement programs absent a security threat, *see* Fla. Admin. R. 33-601.830(7)(n), the FDOC does not offer Mr. Pasha, Mr. Jordan, or other death row inmates at FSP any opportunities to participate in educational or self-improvement programs.

60.     In sum, on most days, Mr. Pasha, Mr. Jordan, and other death row inmates at FSP spend twenty-four hours confined to their cells, with virtually no human contact.  On other days, Mr. Pasha and other death row inmates at FSP spend extremely limited periods outside of their cells, with correspondingly limited human contact.

61.     Mr. Pasha was treated for prostate cancer in 2012 and, due to his placement in indefinite solitary confinement, has not received adequate medical care to deal with the complications from his prostate cancer surgery.

62.     As explained in greater detail below, because Mr. Pasha, Mr. Jordan and the class members at FSP have been subjected to indefinite solitary confinement, they are at serious risk of suffering, and have suffered, serious harm to their mental and physical health, including but not limited to depression, psychosis, suicidal tendencies, and degeneration of eyes, teeth, and muscles.

63.     As explained in greater detail below, Defendants Jones and Jordan have been, and continue to be, deliberately indifferent to the obvious and well-known risks that indefinite solitary confinement poses, as well as the obvious harm that such confinement has caused, to the mental and physical health of Mr. Pasha, Mr. Jordan and the class members at FSP.

   **D.      Conditions in FDOC Prisons Outside Death Row**

64.     Individuals who are in the custody of the FDOC and are not placed in the "single-cell special housing" reserved for death row inmates have the opportunity to, *inter alia*, socialize with other prisoners, eat with other prisoners, hold jobs, make phone calls, and participate in educational, vocational, and self-improvement programs.

65.     Inmates not on death row eat their meals, outside of their cells, with other inmates.  *Cf.* Fla. Admin. R. 33-602.101(2)(b) (referring to clothing inmates must wear while "at food service").

66.     Inmates not on death row are permitted to have jobs within the correctional facilities to which are assigned.  *See* Fla. Admin. R. 33-601.201 ("It is the continuous goal of the department that inmates in work assignments work at least 40 hours per week."); *see also* Admin. R. 33-501.301 (providing for the job of "inmate law clerk"); Admin. R. 33-204.003 (providing for the job of "inmate food handler").

67.     Inmates not on death row are permitted to participate in out-of-cell educational and vocational training.

68.     Inmates not on death row are permitted to maintain a list of up to "10 names and numbers of persons he or she wishes" to call, and are permitted to make calls to those people. Fla. Admin. R. 33-602.205(2)(a); *id.* at (1) (describing the "minimum telephone privileges that shall be granted to inmates").

69.     Even when non-death row inmates in FDOC facilities are placed in solitary confinement for disciplinary or administrative reasons, they are not permanently assigned to solitary confinement and are expected to return to general population.

70.     In "disciplinary confinement," which is "a form of punishment in which inmates found guilty of committing violations of the department rules are confined for specified periods

of time to individual cells based upon authorized penalties for prohibited conduct," an inmate's placement must be reviewed "every week," with the goal being to return the "inmate to the open population as soon as the facts of the case indicate that this can be done safely." Fla. Admin. R. 33-602.222(8). The maximum administrative punishment for the most serious institutional infractions is 60 days in disciplinary confinement. *See* Fla. Admin R. 33-601.314.

71.    In "administrative confinement," which is for inmates who need to be temporarily removed from "the general inmate population in order to provide for security and safety until such time as more permanent inmate management processes can be concluded," an inmate's placement must be reviewed within three days of placement, and procedures to transfer the inmate out of administrative confinement shall be commenced within 20 days unless it is the inmate himself who requested such confinement. *See* Fla. Admin. R. 33-602.220(1),(3).

72.    In "protective management," which is for inmates who need to be temporarily removed from the general population "in order to provide for security and safety until such time as a more permanent inmate management decision can be concluded" (Fla. Admin. R. 33-602.221(1)(a)), an inmate's placement must be reviewed every thirty days, and the "goal shall be toward returning the inmate to general population as soon as the facts of the case indicate that this can be done safely." Fla. Admin. R. 33-602.221(8).

73.    In "close management," which is the "the confinement of an inmate apart from the general population, for reasons of security or the order and effective management of the institution, where the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others," an inmate's placement must be reviewed "at least once every week for the first 60 days and once every 30 days thereafter." Admin. R. 33-601.800(16).

15

74.     Therefore, unlike death row inmates at UCI and FSP, non-death row inmates who are placed in solitary confinement for disciplinary or administrative reasons do not remain in solitary confinement permanently and indefinitely, are generally prohibited from remaining in solitary confinement for extended periods, and are thus able to resume socializing with other prisoners, eating with other prisoners, holding jobs, making phone calls, and participating in educational, vocational, and self-improvement programs.

## II.     THE RISK OF SERIOUS HARM TO HEALTH AND SAFETY POSED BY DEFENDANTS' POLICY OF PERMANENT SOLITARY CONFINEMENT FOR DEATH ROW INMATES

75.     Social scientists have long observed the devastating psychological and physical effects of prolonged solitary confinement. Research has shown that prolonged solitary confinement causes a persistent and heightened state of anxiety and nervousness, headaches, insomnia, lethargy or chronic fatigue (including lack of energy and lack of initiative to accomplish tasks), nightmares, heart palpitations, and fear of impending nervous breakdowns. Other documented effects include obsessive ruminations, confused thought processes, an oversensitivity to stimuli, irrational anger, social withdrawal, hallucinations, violent fantasies, emotional flatness, mood swings, chronic depression, feelings of overall deterioration, and suicidal ideation. Individuals in prolonged solitary confinement frequently fear they will lose control of their anger and thereby be punished further.

76.     Courts have recognized and incorporated this scientific literature in their decision-making. A number of federal judges have expressly acknowledged the extraordinarily harmful psychological effects of prolonged solitary confinement.

77.     In his dissent from the denial of certiorari in *Ruiz v. Texas*, No. 16-7792 (March 7, 2017), Supreme Court Justice Stephen Breyer opined that Petitioner Ruiz had a "strong" claim

16

that serving 22 years in "permanent solitary confinement" on Texas's death row violates the Eighth Amendment's prohibition on cruel and unusual punishment.  Justice Breyer observed that the Supreme Court "recognized long-standing 'serious objections' to extended solitary confinement" as long ago as 1890, and noted that Petitioner Ruiz "has developed symptoms long associated with solitary confinement, namely severe anxiety and depression, suicidal thoughts, hallucinations, disorientation, memory loss, and sleep difficulty."

78.     In his concurrence in *Davis v. Ayala*, 135 S. Ct. 2187 (2015), Supreme Court Justice Anthony Kennedy observed that research confirms that "[y]ears on end of near-total isolation exact a terrible price," and condemned the "human toll wrought by extended terms of isolation." *Id.* at 2210.

79.     In her concurrence in *Hutchinson v. Florida*, 677 F.3d 1097 (11th Cir. 2012), Judge Rosemary Barkett of the U.S. Court of Appeals for the Eleventh Circuit condemned the practice of prolonged solitary confinement for death row inmates.  She observed, among other things, that "the psychological effects of spending extended periods in solitary confinement— commonly known as SHU syndrome—may impair an inmate's mental capabilities to the extent that his active participation in litigation becomes impossible." *Id.* at 1002.  In one of the studies Judge Barkett cited, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325 (2006), Dr. Stuart Grassian, a board certified psychiatrist on the faculty of Harvard Medical School for more than 25 years, concluded that "even those inmates who are more psychologically resilient inevitably suffer severe psychological pain as a result of [solitary] confinement, especially when the confinement is prolonged, and especially when the individual experiences this confinement as being the product of an arbitrary exercise of power and intimidation.  Moreover, the harm caused by such confinement may result in prolonged or

permanent psychiatric disability, including impairments which may seriously reduce the inmate's capacity to reintegrate into the broader community upon release from prison." *Id.* at 355.

80.     Other courts similarly have recognized the deleterious impact of extended periods of solitary confinement. *See, e.g., Shepard v. Quillen*, No. 13-15554, 2016 WL 6246873, at *5 (9th Cir. Oct. 26, 2016) (noting "the horrors of solitary confinement"); *Shoatz v. Wetzel*, No. 2:13-CV-0657, 2016 WL 595337, at *12 (W.D. Pa. Feb. 12, 2016) (noting the "recognized risks and harms of solitary confinement"); *Miller ex. rel. Jones v. Stewart*, 231 F.3d 1248, 1252 (9th Cir.2000) ("[I]t is well accepted that conditions such as those present in SMU II [Special Management Unit II] . . . can cause psychological decompensation to the point that individuals may become incompetent."). *Madrid v. Gomez*, 889 F. Supp. 1146, 1231 (N.D. Cal. 1995) (finding that "when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances," and that there is "ample and growing body of evidence that this phenomenon may occur among persons in solitary or segregated confinement").

81.     In light of the scientific evidence described above, there is now an international consensus that the type of permanent solitary confinement that the FDOC imposes on death row inmates at UCI and FSP violates international human rights standards.

82.     International human rights organizations, including the United Nations, have condemned indefinite or prolonged solitary confinement as a human rights abuse equivalent to torture. For example, in August 2011, the United Nations' Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment concluded that prolonged solitary confinement constitutes torture or cruel, inhuman or degrading treatment or punishment and is, therefore, prohibited by the International Covenant on Civil and

Political Rights and the Convention against Torture.  Accordingly, the Special Rapporteur determined that solitary confinement is acceptable only in exceptional circumstances and that its duration must be as short as possible.  Even 15 days in solitary confinement, according to the Special Rapporteur, constitutes a human rights violation.

83.   Having continuously confined Plaintiffs and class members to "single-cell special housing" for years, Defendants and their predecessors have subjected Plaintiffs and Class members to conditions that are tantamount to torture.  Living indefinitely in stark and restrictive conditions without routine human interaction has created the serious and immediate risk that Plaintiffs and class members will suffer the same psychological and physical infirmities that social scientists have long associated with prolonged solitary confinement, including:

- "[A]ppetite and sleep disturbances" (Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQUENCY 124, 130 (2003));

- "Anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations" (*id.* at 130);

- "[P]rogressive inability to tolerate ordinary stimuli" and "overt paranoia" (Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J. L. & POL'Y 325, 335-36 (2006));

- "Depression, anxiety, [and] stomach and muscle pains" (Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 CRIME & JUSTICE 441, 477 (2006));

- "Suicidal thoughts," "depression," and "hallucinations" (*id.* at 488);

- "Lethargy," "constant headaches," and "a complete breakdown or disintegration of the identity of the isolated individual" (*id.* at 492).

84.    In fact, Plaintiffs and class members, including Mr. Troy, Mr. Stein, and Mr. Whitton have already suffered some, if not all, of these infirmities and others.

85.    Because they have developed these conditions, some Plaintiffs and class members, including Mr. Davis, Mr. Guardado, and Mr. Jordan have struggled to acclimate to settings in which other people are present, such as exercise time.

86.    Certain class members who are already mentally ill are particularly susceptible to these adverse effects.  As the National Commission on Correctional Health Care ("NCCHC") stated in an April 10, 2016 Position Statement, "[i]t is well established that persons with mental illness are particularly vulnerable to the harms of solitary confinement." *See* http://www.ncchc.org/solitary-confinement.

87.    To cope with their living conditions, certain class members, including Mr. Guardado and Mr. Whitton, have developed defense mechanisms that deaden feelings and emotions, which exacts its own psychological toll.

88.    The lengthy duration of Plaintiffs' and class members' imprisonment has only exacerbated the adverse effects of their isolative living conditions.

89.    As one class member puts it, single-cell special housing is "designed to break you psychologically" and is like "keeping an animal in a cage." Another class member says "[I feel] "I am being physically squeezed… and mentally enclosed, too."  Other class members say single-cell special housing is meant to "break your spirit" and "disconnect you from other people, from yourself, and from reality" and that it is "hopeless," a "living death," and "merely existing—not living."  One death row inmate committed suicide after his visitation privileges

were taken away, prompting another to observe, "I think everyone gets to that point. How much more can you take?"

90.     In addition to psychological harm, Plaintiffs and class members have suffered physical problems as a result of their conditions of confinement, including knee pain, back pain, neck pain, and muscle degeneration.

## III.   DEFENDANTS' DELIBERATE INDIFFERENCE TO THE RISK OF SERIOUS HARM POSED BY DEFENDANTS' POLICY OF PERMANENT SOLITARY CONFINEMENT FOR DEATH ROW INMATES.

91.     The above-described social science regarding the deleterious impact of prolonged solitary confinement on psychological and physical health is long-standing and well-known. Indeed, based on that social science, a number of prison systems, both in the United States and around the world, have eliminated the practice of prolonged solitary confinement and have implemented meaningful, robust procedures for routinely reviewing the status of inmates placed in solitary confinement for disciplinary or administrative reasons.

92.     The psychological and physical infirmities that Plaintiffs and class members themselves have developed as a result of being kept in permanent solitary confinement are also obvious. Plaintiffs and class members are in Defendants' custody and care. Defendants either have recognized or turned a willful blind eye toward the "terrible price" that permanent solitary confinement has exacted on the psychological and physical health of Plaintiffs and class members. In fact, Plaintiffs and class members have filed administrative grievances concerning their placement in indefinite solitary confinement. Defendants have denied each one.

93.     Defendants have ignored the social science regarding the adverse, debilitating health effects of prolonged solitary confinement. They have ignored the penal practices adopted in other prison systems that have eliminated prolonged solitary confinement because of these

well-known health effects.  And they have ignored the obvious adverse health effects of the FDOC's permanent solitary confinement policy on prisoners in their own custody and care, *i.e.*, Plaintiffs and class members.  Defendants, therefore, have been and continue to be deliberately indifferent to both the significant risk of harm and the actual harm caused by placing Plaintiffs and class members in indefinite solitary confinement.  That is, Defendants have been and continue to be aware of all of the adverse health effects of placing Plaintiffs and class members in indefinite solitary confinement, yet they continue to keep Plaintiffs and class members in indefinite solitary confinement, notwithstanding their knowledge of such adverse health effects.

94.     FDOC rules governing other forms of restrictive confinement, such as "disciplinary confinement," "administrative confinement," and "close management," underscore Defendants' deliberate indifference to the adverse health effects of keeping Plaintiffs and class members in permanent solitary confinement.  In these rules, which apply to non-death row inmates, Defendants acknowledge the adverse health effects of prolonged solitary confinement by allowing confinement in conditions equivalent to single-cell special housing for only limited periods, by furnishing the opportunity to obtain review of and relief from those conditions, and by ensuring that inmates required to live in those conditions for more than a couple of months undergo routine psychological assessments to determine their continued mental fitness to live in those conditions.  Defendants' simultaneous failure to furnish Plaintiffs and class members similar protections demonstrates that, as to Plaintiffs and class members, Defendants ignore the serious risks of psychological and physical harm posed by prolonged solitary confinement.

95.     For instance, each FDOC inmate placed in disciplinary confinement, among other things, must have his case reviewed every week with the goal of being returned to general population; must be given a psychological screening assessment if confined for more than 30

days and must undergo such screening at least every 90 days; and if housed in disciplinary confinement for more than 60 days, is entitled to a formal evaluation that must include a valid justification for continuing to hold him in disciplinary confinement. *See* Fla. Admin. R. 33-602.222(8). Each FDOC inmate placed in administrative confinement is given similar protections and, in addition, must have his placement reviewed by an institutional classification team within the first 72 hours to ensure it is justified. *See* Fla. Admin. R. 33-602.220(2), (8). Defendants provide Plaintiffs and class members no such protections, despite their knowledge that such protections are necessary to guard against the well-known, adverse effects of prolonged solitary confinement.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

96.     Plaintiffs and the class have exhausted the administrative remedies provided by the State of Florida.

97.     Mr. Davis filed an informal grievance relating to his indefinite solitary confinement on February 15, 2016. It was denied on February 15, 2016. Mr. Davis then filed a formal grievance on February 26, 2016. It was denied on February 28, 2016. Mr. Davis then filed an appeal of the denial of that formal grievance on March 1, 2016. His appeal was denied on March 9, 2016.

98.     Mr. Jordan filed an informal grievance relating to his indefinite solitary confinement on May 19, 2016. It was denied on May 24, 2016. Mr. Jordan then filed a formal grievance on May 25, 2016. It was denied on June 9, 2016. Mr. Jordan then filed an appeal of the denial of that formal grievance on June 14, 2016. His appeal was denied on June 22, 2016.

99.     Mr. Pasha filed an informal grievance relating to his indefinite solitary confinement on March 18, 2016. It was denied on March 22, 2016. Mr. Pasha then filed a

formal grievance on March 23, 2016.  It was denied on April 5, 2016.  Mr. Pasha then filed an appeal of the denial of that formal grievance on April 16, 2016.  His appeal was denied on May 10, 2016.

## CLASS ALLEGATIONS

100.    Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23.

101.    Plaintiffs seek to represent a class of all Florida inmates who are sentenced to death, in the custody of the FDOC, and held at UCI or FSP.

102.    The requirements for maintaining a class action under Federal Rule of Civil Procedure 23(a) are satisfied for the following reasons:

    a.   Numerosity: The members of the class are so numerous that joinder of all members is impractical.  While the exact number of class members will likely change throughout this litigation, the class at this time has hundreds of members.

    b.   Commonality: Defendants subject all class members to the same conditions of confinement:  all death row inmates at UCI and FSP are automatically and permanently placed in "single-cell special housing"—*i.e.,* solitary confinement— without review; all death row inmates at UCI and FSP are housed individually, without cellmates; all death row inmates at UCI and FSP are housed in similarly-sized, cramped cells; all death row inmates at UCI and FSP are given—at most— the same, negligible amount of time outside their cells each week: two three-hour blocks of recreation time and three, five-to-ten minute blocks of shower time; all death row inmates at UCI and FSP are severely restricted from making

24

phone calls. Therefore, there are questions of law and fact that are common to the class and that predominate over individual questions, including:

- o Whether Defendants' placement of class members in indefinite solitary confinement violates the Eighth Amendment's prohibition on cruel and unusual punishment;

- o Whether Defendants' placement of class members in indefinite solitary confinement violates the Due Process Clause of the Fourteenth Amendment;

- o Whether Defendants' placement of class members in indefinite solitary confinement results in constitutionally cognizable harm or presents a constitutionally unacceptable risk of harm;

- o Whether Defendants have been deliberately indifferent to the serious risk of mental and physical suffering of class members;

- o Whether a legitimate penological reason exists for Defendants to place class members in indefinite solitary confinement, sometimes lasting decades, simply because class members have been sentenced to death; and

- o Whether the conditions of confinement for death row inmates at UCI and FSP constitute an atypical and significant hardship compared to the ordinary incidents of prison life.

c. <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the class members because Plaintiffs have suffered the same injury as the class members. In particular, Plaintiffs have been placed in indefinite solitary confinement based on their death sentences alone.

d.  Adequacy: Plaintiffs will fairly and adequately represent and protect the interests

of the class.  Plaintiffs do not have any interests that are adverse to those of the

class members.  Plaintiffs have retained competent counsel experienced in class

action litigation and intend to prosecute this action vigorously.

103.    The prerequisites for maintaining a class action for injunctive relief or equitable

relief under Federal Rule of Civil Procedure 23(b)(2) are met because Defendants have acted or

refused to act on grounds generally applicable to each class member.  In particular, Defendants

have placed each Class member in indefinite solitary confinement.  Therefore, final injunctive

and declaratory relief is appropriate with respect to the class as a whole.

## CAUSES OF ACTION

## COUNT I

### Imposition of Cruel and Unusual Punishment in Violation of the 8th and 14th Amendments (42 U.S.C. § 1983)

104.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 103, above,

as though fully set forth herein.

105.    Defendants' placement of Plaintiffs and class members in indefinite solitary

confinement is the custom, policy, and practice of the State of Florida.

106.    Defendants' placement of Plaintiffs and class members in indefinite solitary

confinement has been and continues to be done under color of state law.

107.    By placing Plaintiffs and class members in indefinite solitary confinement,

Defendants deprive Plaintiffs and class members of basic human needs, including but not limited

to the need for routine social interaction, environmental and sensory stimulation, regular physical

exercise, sleep, and other essential activity.

26

108.    By placing Plaintiffs and class members in indefinite solitary confinement,
Defendants have created an unreasonable risk of serious harm to the psychological and physical
health and safety of Plaintiffs and class members and have in fact done harm to the psychological
and physical health and safety of Plaintiffs and class members.

109.    Defendants' policy of automatically placing Plaintiffs and class members in
permanent solitary confinement is not rationally related to legitimate security needs.

110.    Defendants' policy of automatically placing Plaintiffs and class members in
permanent solitary confinement is extreme and violates contemporary standards of decency.

111.    By placing Plaintiffs and class members in indefinite solitary confinement,
Defendants have acted, and continue to act, with deliberate indifference to the psychological and
physical harm that such confinement threatens to inflict, and in fact inflicts, on Plaintiffs and
class members.  Defendants keep Plaintiffs and class members in indefinite solitary confinement,
without adequate penological justification, despite the well-known social science establishing the
serious psychological and physical harm wrought by prolonged solitary confinement, despite the
court decisions and the consensus of the international human rights community recognizing such
harm, despite the increasing abandonment of prolonged solitary confinement in prison systems
within the United States and around the world based on the recognition of such harm, and despite
evidence that Plaintiffs and class members themselves have suffered such harm while in
Defendants' custody and care.

112.    Defendants' rigid policy of permanent solitary confinement for Plaintiffs and
class members, together with Defendants' deliberate indifference to the significant psychological
and physical harm that their policy threatens to inflict and in fact inflicts on Plaintiffs and class

members, violates the prohibition on cruel and unusual punishment guaranteed by the Eighth and

Fourteenth Amendments to the Constitution.

## COUNT II

### Denial of State-Created Liberty Interests in Violation of
### the Due Process Clause of the 14th Amendment (42 U.S.C. § 1983)

113.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 112, above,

as though fully set forth herein.

114.    Defendants' placement of Plaintiffs and class members in indefinite solitary

confinement is the custom, policy, and practice of the State of Florida.

115.    Defendants' placement of Plaintiffs and class members in indefinite solitary

confinement has been and continues to be done under color of state law.

116.    Defendants' placement of Plaintiffs and class members in permanent solitary

confinement inflicts on Plaintiffs and class members an atypical and significant hardship as

compared with the ordinary incidents of prison life in FDOC facilities.

117.    The conditions in "single-cell special housing" on death row at UCI and FSP are

unduly harsh and restrictive.  They are much more harsh and restrictive than the general

conditions in other units in UCI and FSP or the conditions in other FDOC facilities.

118.    Defendants are permanently confining Plaintiffs and class members in these

atypically brutal conditions without legitimate penological justification.

119.    Because indefinite placement in "single-cell special housing" constitutes an

atypical and significant hardship, Plaintiffs and class members—like all other inmates in FDOC

facilities—are entitled to:  live in less restrictive conditions unless it is determined, after notice

and hearing, that they are required to be placed in solitary confinement; receive a meaningful

explanation of how they can establish their fitness to live in or return to less restrictive housing

28

conditions; and obtain meaningful and timely periodic administrative reviews to determine whether they continue to be required to be kept in solitary confinement.

120. Defendants hold Plaintiffs and class members in permanent solitary confinement without giving them any of these opportunities. In fact, Defendants have forced a number of class members to live in solitary confinement for a decade or more without giving them any chance to establish their fitness to live in less restrictive conditions.

121. Having to live continuously in solitary confinement for such lengthy periods, without being given any opportunity to establish the propriety of being imprisoned in less restrictive conditions, is also atypical in the FDOC. Even inmates placed in disciplinary or administrative confinement or close management in Florida are not housed in those units for anywhere near as long as Plaintiffs and class members and, as set forth above, all of them are given an opportunity to challenge their placement at the outset and routine opportunities throughout their placement to establish that they should rejoin general population and live in less restrictive conditions.

122. Because Defendants' fixed policy of permanent solitary confinement imposes on Plaintiffs and class members an atypical and significant hardship not imposed on other FDOC inmates, and because Defendants further deny Plaintiffs and class members the same opportunity that other FDOC inmates have to seek review of and relief from their restrictive living conditions, Defendants have deprived Plaintiffs and the Class members of a protected liberty interest without due process of law, in violation of the Fourteenth Amendment to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, seek

the following relief:

    A.    An order certifying the class;

    B.    Judgment in their favor and against Defendants;

    C.    A declaration finding that Defendants' policy of permanently placing death row inmates in "single-cell special housing," or solitary confinement, to be in violation of the Eighth and Fourteenth Amendments to the United States Constitution;

    D.    An injunction requiring Defendants to comply with the Eighth and Fourteenth Amendments to the United States Constitution by, *inter alia*:

- abolishing their policy of automatically and permanently housing death row inmates in solitary confinement;

- developing and faithfully applying constitutionally adequate procedures and standards for assigning death row inmates to, periodically reviewing the assignment of death row inmates to, and permitting death row inmates to obtain relief from assignment to "single cell special housing" or similarly restrictive housing in which death row inmates could be placed; and

- any other measure required to bring Defendants into compliance with the Eighth and Fourteenth Amendments to the United States Constitution;

    E.    An order retaining jurisdiction over this case to ensure Defendants' full compliance with the foregoing injunction;

    F.    An order awarding Plaintiffs their costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

    G.    Such other relief as the Court deems just and proper.

30

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated: Jacksonville, Florida
July 19, 2017


Respectfully submitted,

*for:* Linda McDermott (SBN 102857)
**TRIAL COUNSEL**
Martin J. McClain (SBN 754773)
McCLAIN & MCDERMOTT P.A.
141 NE 30th Street
Wilton Manors, FL 33334-1064
Tel. (850) 322-2172
Fax. (954) 564-5412
Lindamcdermott@msn.com


Seth A. Rosenthal
Claire Wheeler
VENABLE LLP
575 7th Street NW
Washington, DC 20004
Tel. (202) 653-3750
Fax. (202) 344-8300
Sarosenthal@venable.com
Cmwheeler@venable.com


Maggie T. Grace
Matthew T. Shea
VENABLE LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
Tel. (410) 244-7400
Fax. (410) 244-7742
Mtgrace@venable.com
Mtshea@venable.com

31

*Attorneys for Plaintiffs Mark Davis, Mark Geralds, Jesse Guardado, Joseph Jordan, Khalid Pasha, Robert Rimmer, John Troy, Steven Stein, and Gary Whitton*