**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**


**MARK DAVIS, et al.,**
*Plaintiffs,*


v.                                                                    *Case No.: 3:17-cv-820-MMH-PDB*


**RICKY D. DIXON, et al.,**
*Defendants*

_____/


## MOTION TO COMPEL COUNSEL TO COMPLY WITH SETTLEMENT AGREEMENT


Comes now the Plaintiffs, proceeding Pro se, and respectfully submits this Motion to Compel Counsel to comply with the Settlement Agreement and the Rules of Professional Conduct. Counsel has continuously ignored Plaintiffs' pleas to correct the record and address the breaches seen herein. As will be seen in this Motion, Counsel has violated the Rules of Professional Conduct and has raised the question of possible improprieties between the Florida Department of Corrections (FDOC) and Counsel, Mr. Shea.

**Plaintiffs aver the following:**

1. Plaintiff Clark and others have made repeated efforts over the past year to have Counsel act in accordance with the Rules of Professional Conduct, 4-1 CLIENT LAWYER RELATIONSHIP specifically:

    o **4-1.3: Diligence**
       A lawyer shall act with reasonable diligence and promptness in representing a client.
    o **4-1.4: Communication**
       (a) Informing Client of Status of Representation. A lawyer shall:
       (3) keep the client reasonably informed about the status of the matter.
       (4) promptly comply with reasonable requests for information.

2. Each month, the State of Florida submits a motion titled *"Defendants Monthly Status Report."* Contained within this motion is the sworn declaration of Carl Wesley Kirkland Jr., the Deputy Director of Institutional Operations for the Florida Department of Corrections (FDOC). Plaintiffs assert that this declaration contains unequivocal perjured testimony. Plaintiffs have made every attempt to have counsel of record, Mr. Evan Shea of Venable LLP, and Liaison Counsel, Mrs. Linda McDermott, correct the record to no avail.

3. As officers of the court, Plaintiffs' counsel has a duty to notify this court of any perjured statements or documents before it. Plaintiff Ronald W. Clark Jr. notified counsel as far back as November 2023 via email to Mrs. McDermott regarding Mr. Kirkland's perjured declaration. However, counsel has failed to correct the record, allowing this perjured declaration to remain uncontested and stand as fact. Counsel can access FDOC documents, including **DC6-229's** Daily Record of Special Housing, testimony from the Florida National Guardsmen, and P-Dorm video evidence, which supports this claim of perjury.

1

4. On April 9, 10, 16, and 26 of 2024, Plaintiff Ronald W. Clark Jr. sent Mrs. McDermott further emails addressing ongoing breaches. In an email dated April 24, 2024, at 8:55 AM, Mrs. McDermott stated, *"I don't check my emails daily or even weekly."* This admission was shared with other Plaintiffs, one of whom rightly pointed out, *"if she's not checking her emails weekly, then how can she say she's staying on top of these breaches?"* This statement illustrates a clear lack of due diligence as required under **Rule 4-1.3.**

5. These communications led to a phone call on Monday, April 29, 2024, from 10:00 AM to 10:45 AM, between Plaintiff Ronald W. Clark Jr., Mr. Evan Shea, and Mrs. McDermott. During this call, Mr. Clark raised concerns about the perjured declaration and breaches, including the failure to provide the three-hour daily minimum day room time required under Paragraph 25 of the Settlement Agreement. Mr. Shea stated, *"if you're getting 6 hours on Monday, 6 hours on Tuesday, and 6 hours on Wednesday, then you're getting more than the required minimum 15 hours a week."* Mrs. McDermott denies that Mr. Shea made this statement, but Mr. Clark clearly heard Mr. Shea's position on the hours per week. Mr. Clark reiterated Mr. Shea's position in his May 5, 2024 email *(see attached as EXHIBIT A)*, outlining what **Paragraph 25** states about a minimum of three hours per business day. Mrs. McDermott, in her May 6 and 9 emails *(see attached as EXHIBIT B and C)*, stated that Mr. Clark clearly misunderstood and misrepresented what Mr. Shea stated.

6. Due to this alleged misunderstanding, Mr. Clark insisted that all further communications between Plaintiff and Counsel should be conducted through correspondence. As a result, Mr. Shea on October 17, 2024, wrote the following in his letter regarding **Mark Davis v. Ricky Dixon, et al.,** Civ. No. 17-820-J-34PBD *(see attached as EXHIBIT D)*:

*"Regarding 'day room' time, we continue to communicate with inmates on Death Row about the amount of day room time being provided. If we determine that the defendants are materially falling short of their obligations under the settlement agreement, we will address the issue with the Florida Department of Corrections (FDC), and, if necessary, the Court. Please keep in mind, however, that if day room access is cut short or entirely canceled on a given day, the FDOC is permitted under Paragraph 27 of the Settlement Agreement to provide make-up day room time up to 2 hours per week."*

This position taken by Mr. Shea here mirrors what he stated during the April 29, 2024 phone call, which Mrs. McDermott attempts to deny.

7. When viewing EXHIBIT (D), the second paragraph of counsel's letter addresses **paragraphs 25 and 27** of the Settlement Agreement. Nowhere in **paragraph 27** does it permit the FDC to cancel or shorten the hours of the day room. The two-hour makeup time that Mr. Shea is referring to deals with inmates who have a medical, legal, or other appointment that conflicts with the day room time that day, allowing for a two-hour makeup within 30 days. The Settlement Agreement unequivocally states that defendants **"shall"** offer all eligible death row inmates access to the day room and day room area for at least three hours per business day. The Settlement Agreement didn't say defendants will try; it said they **"shall"** Mr. Shea, as an attorney, knows or should know that **"shall"** is a legal term directing an individual to do what they are required to do. Here, it seems Mr. Shea is trying to justify why he hasn't corrected the perjured declaration of Mr. Kirkland, which the plaintiff has been attempting to have him correct for the past year. **Paragraph 25** states that we will receive a minimum of three hours. If your Honor looks at the records, you will see the day room is often open 5 to 10 minutes late and closing 5 minutes early.

2

8. **Paragraph 27** of the Settlement Agreement has been breached on numerous occasions, where plaintiffs' day room and recreation time conflicted, forcing plaintiffs to choose between day room and recreation, and vice versa. This can be substantiated in the **DC6-229** Daily Record of Special Housing. During the April 29, 2024, phone call, counsel stated this should be resolved because defendants had arbitrarily changed the manner in which day room was being operated on that very day, allowing plaintiffs to have 4 hours of day room in the morning and recreation in the evening, or vice versa. This way of operating lasted only two months before defendants reverted to the previous schedule in June.

9. When the day room was initially approved in the pilot program and opened on all wings, there were 6 to 7 plaintiffs out at one time for day room. The front half would have day room in the morning from 8:00 AM until 12:00 PM, and the back half in the afternoon from 1:00 PM until 5:00 PM. Each day, the schedule would rotate from the back to the front for morning or afternoon day room. Thus, we had an actual schedule; however, now we have no idea of our day room hours. The plaintiff has personally missed recreation time, not wanting to sacrifice day room for recreation. The plaintiff has pleaded with counsel to establish a schedule, to no avail.

10. Plaintiff Clark has also pleaded with counsel to distribute a questionnaire to the 200-plus plaintiffs asking about breaches. Again, counsel is not cooperating. This questionnaire is a reasonable request that would assist counsel in identifying all breaches, which could be substantiated by reviewing camera footage and the **DC6-229** records.

11. Plaintiff Clark also addressed the work assignments laid out on page 7 under **paragraph 38** during his conversation with counsel on April 29, 2024, raising the fact that work assignments have been anything but routine. As stated in claim 9 above, when the day room initially started, the front half would be out in the morning, and two housemen from the back half would be working in the evening, while the back half participated in day room. This came to a halt when the schedule was changed on November 18, 2022. We have gone through several changes, and now we have it where one houseman per day works from 11:00 AM until 1:00 PM and from 4:00 PM until 5:00 PM. This has been a failure. Wing staff will not let plaintiffs out on time, or sometimes not at all. Plaintiffs will be required to lock down in the middle of their work, hot, sweaty, and unable to shower, and at times no cleaning supplies are offered. Counsel has done nothing to resolve this.

12. Mr. Clark, in recent weeks, informed Mr. Shea that he would be filing this motion as well as a bar complaint. This resulted in Mr. Shea responding to the three issues in EXHIBIT (D). As seen in the third paragraph, it led Mr. Clark and other plaintiffs to discover that Mr. Shea made concessions regarding the work assignments mentioned on page 7 under **paragraph 38** of the Settlement Agreement. This Court ordered the defendants to issue a monthly report documenting how many death row inmates have requested and received work assignments. This is addressed monthly in Mr. Kirkland's declaration on page 2 under section (c), where he states, *"All eligible death row inmates have been assigned a work assignment."* This is not true; Sean Smith has requested a houseman job only to be told that he would have to wait until his monthly review next year. Mr. Clark discussed this with Sean Smith in September. We were still under the impression that we must write in and request a work assignment due to this Court's order, not realizing that Mr. Shea made concessions without notifying us.

13. On January 12, 2023, our Classification Officer, Mrs. Jones, passed out a form and stated, *"If you want a job, you need to sign this. If you don't want one, check 'no' and sign it. But it's now or never."*

Mr. Clark informed her that this isn't how its supposed to be. If we want a job we are to write in and request one. She informed us that that she was told to do it this way. Mr. Clark immediately wrote a memorandum to counsel and sent it via email on January 12, 2023, at 12:13 PM. See attached as EXHIBIT (E) MEMORANDUM. Counsel never responded to this.

14. In **paragraph 3** Mr. Shea's October 17, letter, he states:
"Regarding work assignments, participation, is only available under paragraph 38 of the Settlement Agreement for inmates who 'opt in at the start of the program. This was a necessary concession to inmates who objected to the settlement agreement on the grounds that they did not wish to work and did not want to be punished for not doing so. If someone who initially opted out now wishes to participate, we can certainly request an exception from the FDOC, though it is important to understand that they are not obligated to grant it."
Mr. Shea made these concessions without the plaintiff's knowledge. So on January 12, 2023, we made an uninformed decision based on Mr. Shea not keeping us informed of the concessions he was making in this settlement agreement, which is a violation of the **Rules of Professional Conduct under 4-1.**, Communication:
**(a)** Informing Client of Status of Representation. A lawyer shall:
**(3)** Keep the client reasonably informed about the status of the matter
**(4)** Promptly comply with reasonable requests for information.
Mr. Shea had a legal, moral, and ethical obligation to keep us informed of any and all concessions made in this settlement agreement, so the plaintiffs could make an informed decision. The plaintiffs knew nothing about an opt-out concession.

15. Now we are questioning how many of these arbitrary changes that have been made regarding day room hours and the times when inmates are out are due to other back-room concessions that counsel has agreed to without our knowledge, as well as questioning the integrity of this entire Settlement Agreement.

16. We ask this Honorable Court to please understand that the FDOC has reputation for immoral and unethical dealings with counsel, contractors, etc. Therefore, a slight appearance of improprieties raises red flags. The Secretary of the FDOC, James V. Crosby Jr., in 2006, was sent to prison for illegal dealings with Keefe and other contractors and their counsel. Under Secretary Ricky Dixon, in 2019, as the acting Deputy Secretary, Inspector General Lester Fernandez wanted to question him about criminal acts that took place at Madison Correctional Institution, where FDOC employees impersonated and FDLE law enforcement officer to remove physical evidence from an evidence room in a criminal investigation, where FDOC employees were introducing contraband into the institution. Mr. Dixon refused to cooperate in the investigation and threatened to "lawyer up," which was reported by Samantha Gross in the Miami Herald on September 30, 2020. This is why the slightest appearance of any possible improprieties between our counsel and the FDOC raises red flags for the plaintiffs.

17. To further address the Work Assignment, as plaintiff Jesse Guardado stated, "Show me a job where you work three hours once a month. That's not a real job." Plaintiff Clark agrees and tried to get counsel to have the Defendants allow Plaintiffs to take the houseman positions on Saturday and Sunday, and throughout the week when the day room isn't operating. It would be no different than what we do between 11:00 AM and 1:00 PM and 4:00 PM and 5:00 PM. Counsel hasn't taken this to the state, or if they have, they've failed to provide us with any information.

18. In the Settlement Agreement, on pages 9-11 **under Section B. Inspection, Access, and Communications, paragraphs 51-56** permits counsel to conduct up to four onsite compliance assessments per calendar year while this Court retains jurisdiction. Plaintiffs have repeatedly

4

pleaded with counsel to conduct these onsite compliance assessments, but to no avail. However, in Mr. Shea's **October 17, 2024,** letter, he agreed to conduct an onsite compliance assessment, which was finally carried out on Tuesday, **November 12, 2024**. It should not have required Mr. Clark threatening to file this Motion and a Bar Complaint to ensure compliance.

19. These assessments should have been conducted over the past two years while the Florida National Guardsmen operated the day room, as they would have provided invaluable information to counsel. Such information could have been presented to this Court. Due to the animosity between FDOC staff and the Florida National Guardsmen, the Guardsmen would have willingly spoken openly and honestly about their observations, including breaches, instances of corruption, and necessary or potential changes. Our counsel failed us miserably by neglecting to complete these critical onsite compliance assessments while the Guardsmen were overseeing the day rooms. Moreover, during **November 12, 2024**, onsite compliance assessment, counsel failed to interview the Guardsmen who were actively present in the day rooms and any plaintiffs outside of the presence of (FDOC) staff.

20. During this **November 12, 2024**, onsite compliance assessment, Mrs. McDermott and Mr. Shea's assistant from the New York office were accompanied by a dozen or more (FDOC) administrators. Their presence intimidated most plaintiffs, discouraging them from speaking candidly to counsel. Mr. Clark, however, spoke openly about the breaches, showing counsel the black oily substance in the contaminated drinking water and the mold growing through the paint on the shower walls. Staff later informed Mr. Clark that the administration was displeased with what he disclosed and showed to counsel.

21. This type of intimidation highlights the urgent need for counsel to distribute questionnaires about any breaches, accompanied by self-addressed return envelopes. This would allow plaintiffs to report breaches without fear of retaliation. On Wednesday, November 13, 2024, Mr. Clark emailed Mrs. McDermott to once again suggest the use of questionnaires. Mr. Clark also discovered that counsel didn't do an assessment of ever wing, although they were entitled to do so according to paragraph 52 of the settlement agreement. Thus this onsite compliance assessment fell short of this Court's intentions.

22. Plaintiffs have lost confidence in counsel who has unequivocally made backdoor concessions without informing plaintiffs of these decisions, and has failed to enforce the Settlement Agreement or address arbitrary changes implemented over the past two years. These changes deviate from the pilot program outlined in the Settlement Agreement, upon which everything was based.

23. On **page 18 of the Settlement Agreement**, under **Section K. Amendment, paragraph 88** explicitly states that if both parties wish to make changes to this agreement, they must do so in writing, and this Court must approve any modifications. Counsel has allowed changes and concessions regarding job assignments, while Defendants have unilaterally made numerous modifications to the agreed-upon structure of the pilot program. The day room was constructed for no more than seven plaintiffs at one time, yet this agreed-upon condition has been violated, thereby breaching this Court's final agreement.

24. During the preparation of this motion, the Florida National Guardsmen had an appreciation day at RMC on Thursday November 7, 2024 for which they were informed that they (the Florida National Guardsmen assigned here to P-Dorm death row housing) would be extended until June 2025 where they would be phased out as the FDC hired replacement staff to fill these positions. As stated above plaintiff forced counsel into this November 12, 2024 on site compliance assessment. This same week of November 12, the FDC reversed course informing the National

5

Guardsmen that the mission here on Florida's death row would be ending on Wednesday December 4, 2024.

25. Due to counsel's failure to comply with these onsite compliance assessments, and the FDC's sudden change of course the first and only onsite compliance assessment, of now removing the National Guards, although UCI does not have sufficient staff to fill th 22 day room post, it is our contention that our counsel and he FDC has come an agreement working behind plaintiff's back, to remove the Florida National Guards, so the six months period for which this Court stated it would retain jurisdiction would expire, and counsel could wash their hands of any further duties with onsite compliance assessments, and the FDC would be allowed to get out from under this Court's watchful eye.

26. Furthermore Mr. Clark would like for this Court to take notice, that after this November 12, 2024 onsite compliance assessment, that plaintiff wrote Mrs. McDermott simply asking for the name of this LLP venables assistant that came with Mrs. McDermott during this onsite compliance assessment and the names of the other individuals in the group. This is not privileged information. However, Mrs. McDermott's refusal to give plaintiff's the names, is further sewing division and distrust between plaintiffs and counsel, that seems to be working in the FDC's best interest.

27. Plaintiffs has made numerous pleas to counsel to have the FDC place the day room agreement into 33-601.830 Death Row Florida Administrative Codes to no avail. Plaintiff is pleading with this Court to oversee the implementation of the terms of this settlement agreement into 33-F.A.C.

Wherefore, Plaintiffs respectfully plead with this Court to conduct an evidentiary hearing, giving Plaintiffs an opportunity to address these breaches. Counsel has clearly failed to act within the terms of the Settlement Agreement or in Plaintiffs' best interest, allowing substantiated breaches to persist unaddressed, excusing these breaches, and permitting perjured declarations before this Court. Plaintiffs humbly pray for the court's intervention to rectify the perjured declaration of Mr. Carl Wesley Kirkland Jr. and to allow Plaintiffs to voice their concerns regarding the breaches and the issues detailed in this Motion to Compel.

Thank you.

Signature

Date

6

**CERTIFICATE OF SERVICE**

I Ronald W. Clark, Jr. do hereby certify that a true and correct copy of this motion has been furnished by U.S. First Class mail this ___//___ day of December 2024 to the following individuals.

Judge Marcia Morales Howard
Middle District of Florida
Bryan Simpson U.S. Courthouse
300 North Hogan Street, Suite 9-150
Jacksonville, Florida 32202

Judge Patricia Barksdale
Middle District of Florida
Bryan Simpson U.S. Courthouse
300 North Hogan Street, Suite 9-150
Jacksonville, Florida 32202

U.S. District Court
Middle District of Florida
Bryan Simpson U.S. Courthouse
300 North Hogan Street, Suite 9-150
Jacksonville, Florida 32202

Linda McDermott Esq.
227 N. Bronough Street
Suite 4200
Tallahassee, Florida 32301-1300

Evan T. Shea Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, MD. 21202

Office of the Attorney General
Corrections Litigation Bureau
PL-01 The Capital
Tallahassee, Florida 32399-1050

Dan Johnson General Counsel
501 S. Calhoun Street
Tallahassee, Florida 32399

Ronald Wayne Clark Jr. 812974
Union Correctional Institution
P.O. Box 1000
Raiford, Florida 32083

7